AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Facebook User ID Number: 61575000350137<br>used by Erick Covarrubias<br>("Subject Account 2") | ) ) ) ) ) )  Case No. 26-mj-00178 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the _Northern_ District of _California_, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 952,960 | Importation of Controlled Substances |
| 21 U.S.C. § 963 | Conspiracy |

The application is based on these facts:
See Affidavit of HSI SA Brian Ficucell, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Brian Ficucell*
Applicant's signature

Brian Ficucell, HSI SA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _Telephone_ *(specify reliable electronic means)*.

Date: 01/14/2026

Judge's signature

City and state: San Diego, CA     Hon. Karen S. Crawford, United States Magistrate Judge
Printed name and title

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR SEARCH WARRANT

I, Brian Ficucell, Special Agent with Homeland Security Investigations ("HSI"), being duly sworn, hereby state as follows:

## I
## INTRODUCTION

1. This affidavit supports an application for a warrant directing Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California, a social-media platform, to disclose records and other information in its possession, pertaining to the subscriber or customer associated with the following accounts:

- <u>Facebook User ID Number</u>: 61552831532928, used by Erick Covarrubias ("COVARRUBIAS") ("**Subject Account 1**")
- <u>Facebook User ID Number</u>: 61575000350137, used by COVARRUBIAS ("**Subject Account 2**")

Collectively, (the "**Subject Accounts**")

***Temporal Scope of Search***

2. Regarding the search of the **Subject Accounts**, the temporal scope of this search shall be from **July 9, 2024** to **April 18, 2025**, which covers the date of the first message on Facebook between Lisa Rosenfeld and COVARRUBIAS, up to the date of the instant offense.

***Scope of the Requested Warrant***

3. Based on the facts contained below, I believe the **Subject Accounts** will contain evidence of a crime; contraband, fruits of crime, or other items illegally possessed; property designed for use, intended for use, or used in committing a crime, in relation to violations of federal law, including Title 21, United States Code, Sections 952, 960 and 963.

//
//

1

## II

## AGENT BACKGROUND

4. I have been employed as a Special Agent with HSI since 2011. I am currently assigned to the HSI Office of the Special Agent in Charge, in San Diego, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

5. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

6. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones and applications installed on the cellular telephones, such as Facebook, that allow for communication within the application. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry, Otay Mesa Port of Entry, and Tecate Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may

1 communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States.

7. The facts are set forth in substance and are not verbatim, unless otherwise noted. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause.

## III

## FACTS SUPPORTING PROBABLE CAUSE

### April 18, 2025 Importation of Methamphetamine Offense by Rosenfeld

8. On April 18, 2025, at approximately 11:20 a.m., Lisa Rosenfeld, ("Rosenfeld"), a United States citizen, applied for entry into the United States from Mexico through the San Ysidro Port of Entry in vehicle lane #27. Rosenfeld was the driver, sole occupant, and registered owner of a 2006 Toyota Tundra ("the vehicle") bearing California license plates.

9. A Canine Enforcement Team was conducting pre-primary operations when the Human and Narcotic Detection Dog alerted to the bed of the vehicle. A Customs and Border Protection Officer observed vacuum sealed bags containing a white crystal substance under the vehicle.

10. A Customs and Border Protection Officer ("CBPO") received two negative Customs declarations from Rosenfeld. Rosenfeld stated she was crossing the border to go to Pine Valley, California.

11. A CBPO operating the Z-Portal X-Ray machine detected anomalies in the bed of the vehicle.

12. Further inspection of the vehicle resulted in the discovery of 27 packages concealed under the bed of the vehicle in a non-factory compartment, with a total approximate weight of 63.12 kgs (139.16 lbs). A sample of the substance contained within the packages field tested positive for the characteristics of methamphetamine.

13. Rosenfeld was placed under arrest at approximately 2:10 p.m.

3

14. During a post-*Miranda* interview, Rosenfeld stated that she thought she was crossing the border with currency or counterfeit currency. Rosenfeld stated she was going to receive a call after she crossed into the United States with instructions on where to go. Rosenfeld stated she was not told how much she was going to be paid.

15. Rosenfeld was charged with a violation of Title 21, United States Code, 952 and 960, importation of a controlled substance.

### *Rosenfeld Stated that she Used Facebook to Communicate With Her Smuggling Recruiter, COVARRUBIAS*

16. During a post-*Miranda* interview, Rosenfeld stated that approximately two weeks prior, she had driven from the United States into Mexico and stayed with her friend Eric COVARRUBIAS. Rosenfeld stated that during that two-week period, COVARRUBIAS worked on her vehicle, and that he had worked on her vehicle before, approximately one month prior. Rosenfeld stated that she suspected COVARRUBIAS was responsible for putting the drugs in her vehicle. Rosenfeld stated that she communicated with COVARRUBIAS through Facebook. Rosenfeld also stated that she had met COVARRUBIAS when they went to school together for their associate degrees around 2013-2015, and she had recently reconnected with him.

### *Rosenfeld and COVARRUBIAS First Communicated on Facebook on July 9, 2024*

17. During the post-*Miranda* interview, Rosenfeld gave consent for agents to search her iPad. Agents saw during that consent search that the first message between Rosenfeld and COVARRUBIAS was July 9, 2024 (the starting date for the requested temporal scope of the searches).

### *COVARRUBIAS has a Prior Drug Trafficking Conviction*

18. During the consent search of Rosenfeld's iPad, agents saw a photograph of COVARRUBIAS' identification card with his photograph and date of birth.

19. Using the name and date of birth on the identification card seen on Rosenfeld's iPad, a search of COVARRUBIAS' criminal history record indicated that on

4

September 29, 2018, COVARRUBIAS was arrested and charged for violating 21 U.S.C. §§ 952, 960, when he applied for entry through the San Ysidro POE with 37.58 kilograms of methamphetamine concealed in his vehicle, case 18cr4682-GPC, U.S. District Court, Southern District of California.

20. On May 21, 2019, COVARRUBIAS was found guilty by a jury of Importation of Methamphetamine. On November 9, 2019, he was sentenced to 82 months in prison.

### Agents Search Rosenfeld's Facebook Account

21. On July 29, 2025, the Honorable Daniel E. Butcher signed a search warrant for Rosenfeld's Facebook account (25mj4091-DEB).

22. Agents' search of the information received from Rosenfeld's Facebook account, pursuant to the search warrant, indicated COVARRUBIAS' Facebook User ID Number as 61552831532928, labeled within Facebook as "Erick Covarrubias" and previously identified by Rosenfeld as belonging to COVARRUBIAS, **Subject Account 1**.

23. Agents' search of the information received from Rosenfeld's Facebook account, pursuant to the search warrant, also indicated that COVARRUBIAS used Facebook User ID Number 61575000350137 (labeled within Facebook as "Victor Covarrubias"), **Subject Account 2**, to communicate with Rosenfeld.

    a. On April 4, 2025, **Subject Account 2** send the following message to Rosenfeld "Irse [It's] me Erick."

    b. On April 8, 2025, Rosenfeld responded to **Subject Account 2** "I see it's you Erick."

### Basis for Evidence Sought in Search Warrant

24. Based on the above investigation, and my training, experience, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that COVARRUBIAS was using the **Subject Accounts** to communicate with others, including Rosenfeld, to smuggle controlled substances from Mexico into the United States. Specifically, searches of social media accounts of individuals involved in the importation of controlled substances may yield evidence:

a. tending to identify co-conspirators, criminal associates, or others involved in the importation of controlled substances from Mexico into the United States, including individuals who produce, promote, and/or display their illicit activities and lifestyle using Facebook;

b. tending to identify communications, photographs, videos, or other data shared that show co-conspirators coordinating and executing violations of Title 21 U.S.C. § 952 and 960;

c. tending to identify data tending to demonstrate the pattern of travel for sales, common meeting locations, or stash houses;

d. tending to identify access logs and other records, information, or evidence indicating how and when the **Subject Accounts** were accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

e. tending to identify records, information, or evidence tending to demonstrate the identity of the person(s) exercising care, custody, or control over the **Subject Accounts**;

f. tending to identify communications, photographs, videos, or other data regarding the importation of controlled substances from Mexico into the United States; and

g. tending to identify accounts, facilities, storage devices, and/or services – such as email address, IP addresses, and phone numbers and/or other accounts used to facilitate the importation of controlled substances from Mexico into the United States.

## IV

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

19. The United States has not attempted to obtain this data by other means.

# V
# META/FACEBOOK

20. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, locations, and other information with other Facebook users, and sometimes with the general public.

21. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

22. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP addresses used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

23. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

24. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself

or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

25. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

26. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

27. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

28. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

29. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

30. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

31. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

32. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

33. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

34. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

35. As described herein, Meta logs the Internet Protocol ("IP") addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the

geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.

36. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

37. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

38. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

39. Based on my training and experience as a law enforcement officer and consultations with other law enforcement officers' experiences in working with Meta, I believe that Meta may collect and can provide, among other things, the following information:

    a. **Usage Information.** Meta may collect information about how users interact with its services, including which search queries they submit, and how they communicate with other users, including maintaining a log of direct communications and posts to and from an account;

    b. **Device Information.** I believe Meta collects information about the devices of its users, including information about the user's hardware and software, such as the hardware model, operating system version, device memory, advertising identifiers, browser type, language, battery level, and time zone; information from device sensors, such as accelerometers, gyroscopes, compasses, microphones, and whether the use has headphones connected; and information about the user's wireless and mobile network connections, such as mobile phone number, service provider, and signal strength;

    c. **Location Information.** Meta may collect information about the user's location, including precise location using methods that include GPS, wireless networks, cell towers, WiFi access points, and other device sensors, such as gyroscopes, accelerometers, and compasses; and

    d. **Location History.** Meta may maintain location history for users utilizing Facebook over iOS and/or Android apps.

    e. **Stored Communications.** Meta may maintain the stored communications of the Facebook Accounts for users utilizing Facebook over iOS and/or Android apps.

    f. **Stored Photographs.** Meta may maintain the stored photographs for users utilizing Facebook over iOS and/or Android apps.

# VI

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

40. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Meta are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Meta for the relevant accounts and then to analyze the contents of those accounts on the premises of Meta. The impact on Meta's business would be disruptive and severe.

41. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the **Subject Accounts**, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Meta, to protect the privacy of ISP subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, HSI seeks authorization to allow Meta to make a digital copy of the entire contents of the account subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

42. Analyzing the data to be provided by Meta may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

43. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within **ninety (90) days** of receipt of the data from the service provider, absent further application to this court.

44. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the **Subject Accounts** and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

45. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

//
//
//
//
//
//
//
//
//
//
//
//

# VII
# CONCLUSION

46. Based on the foregoing, there is probable cause to believe that the items identified in Attachment B, will be found at the **Subject Accounts** to be searched as provided in Attachments A-1 and A-2.

47. I declare under penalty and perjury the foregoing is true and correct to the best of my knowledge and belief.

*Brian Ficucell*

Brian Ficucell, Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 14th day of January, 2026.

The Hon. Karen S. Crawford
United States Magistrate Judge

14

## ATTACHMENT A-2

### DESCRIPTION OF LOCATION TO BE SEARCHED

This warrant applies to information associated with the following Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. Meta Platforms, Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1 Meta Way, Menlo Park, CA 94025:

- <u>Facebook User ID Number</u>: 61575000350137 used by Erick COVARRUBIAS ("**Subject Account 2**")

# ATTACHMENT B
# DESCRIPTION OF ITEMS TO BE SEIZED

## I. SERVICE OF WARRANT

The officer executing the warrant shall permit Meta Platforms, Inc. ("Meta"), as custodian of the computer files described in Section II below, to locate the requested data and provide said data to the same officer.

## II. ITEMS TO BE PROVIDED BY META PLATFORMS, INC.

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for the account listed in Attachments A-1 and A-2 for the period of **July 9, 2024 through April 18, 2025** (the date of the first message on Facebook between Lisa Rosenfeld and Erick COVARRUBIAS, up to the date of the instant offense):

   a. All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

   b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

   c. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

   d. All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings;

    friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

f. All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, location data, and pending "Friend" requests;

g. All "check ins" and other location information;

h. All IP logs, including all records of the IP addresses that logged into the account;

i. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j. All information about the Facebook pages that the account is or was a "fan" of;

k. All past and present lists of friends created by the account;

l. All records of Facebook searches performed by the account;

m. All information about the user's access and use of Facebook Marketplace;

n. The types of service utilized by the user;

    o. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

    p. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

    a. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## III. ITEMS TO BE SEIZED

The search of the data supplied by Meta pursuant to this warrant will be conducted by HSI as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of **July 9, 2024** up to and including **April 18, 2025** and to the seizure of communications of any form, writings, images, call logs, contacts, records, videos, attachments, internet searches, location data, or photographs::

    a. tending to identify co-conspirators, criminal associates, or others involved in the importation of controlled substances from Mexico into the United States, including individuals who produce, promote, and/or display their illicit activities and lifestyle using Facebook;

    b. tending to identify communications, photographs, videos, or other data shared that show co-conspirators coordinating and executing violations of Title 21 U.S.C. § 952 and 960;

    c. tending to identify data tending to demonstrate the pattern of travel for sales, common meeting locations, or stash houses;

    d. tending to identify access logs and other records, information, or evidence indicating how and when **Subject Account 1** and **Subject**

    **Account 2** were accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

e. tending to identify records, information, or evidence tending to demonstrate the identity of the person(s) exercising care, custody, or control over **Subject Account 1** and **Subject Account 2**;

f. tending to identify communications, photographs, videos, or other data regarding the importation of controlled substances from Mexico into the United States; and

g. tending to identify accounts, facilities, storage devices, and/or services – such as email address, IP addresses, and phone numbers and/or other accounts used to facilitate the importation of controlled substances from Mexico into the United States.

which are evidence of violations Title 21, United States Code, Section 952, 960, and 963.